UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KIMBERLY A. ROGERS,

                        Plaintiff,

        v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,[1]

                        Defendant.

CASE NO. 12-CV-05573 RBL JRC

REPORT AND
RECOMMENDATION ON
PLAINTIFF'S COMPLAINT

Noting Date: September 6, 2013

        This matter has been referred to United States Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR 4(a)(4), and as authorized by *Mathews, Secretary of H.E.W. v. Weber*, 423 U.S. 261, 271-72 (1976).  This matter has been fully briefed (*see* ECF Nos. 15, 16, 17).

---

        [1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

After considering and reviewing the record, the Court finds that the ALJ failed to provide specific and legitimate reasons for his failure to credit fully opinions from plaintiff's treating psychiatrist and examining doctor. The ALJ rejected their opinions with a finding that inconsistencies existed in their opinions, yet the ALJ failed to identify any legitimate inconsistencies. The ALJ also found that there was absolutely no evidence to support an opinion by the treating psychiatrist when in fact the ALJ had ignored multiple significant pieces of evidence supporting the opinions of the treating psychiatrist.

For these and other identified reasons herein, and based on the relevant record, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration.

<u>BACKGROUND</u>

Plaintiff, KIMBERLY A. ROGERS, was born in 1968 and was 41 years old on the alleged date of disability onset of November 4, 2009 (*see* Tr. 53, 144-45). Plaintiff has a bachelor degree in computer science.   Plaintiff has a long work history (Tr. 150-59) and was working as a senior security consultant for Verizon Business when she went on medical leave and subsequently was terminated when she was unable to return to work (Tr. 66, 78-79).

Plaintiff has at least the severe impairments of fibromyalgia, obesity, left shoulder supraspinatus teninopathy and bursitis, and post-traumatic stress disorder ("PTSD") (*see* Tr. 38).

At the time of the hearing, plaintiff was living with her daughter, brother, brother's ex-wife and their children (Tr. 67).

<u>PROCEDURAL HISTORY</u>

Plaintiff filed an application for disability insurance ("DIB") benefits pursuant to 42 U.S.C. § 423 (Title II) on March 26, 2010 (*see* Tr. 144-45). Her application was denied initially and following reconsideration (Tr. 81-82). Plaintiff's requested hearing was held before Administrative Law Judge Verrell Dethloff ("the ALJ") on October 18, 2011 (Tr. 63-80). On November 18, 2011, the ALJ issued a written decision in which he concluded that plaintiff was not disabled pursuant to the Social Security Act (Tr. 35-57).

On May 15, 2012, the Appeals Council denied plaintiff's request for review, making the written decision by the ALJ the final agency decision subject to judicial review (Tr. 1-3). *See* 20 C.F.R. § 404.981. Plaintiff filed a complaint in this Court seeking judicial review of the ALJ's written decision (*see* ECF No. 1). Defendant filed the sealed administrative record regarding this matter ("Tr.") on September 11, 2012 (*see* ECF Nos. 10, 11).

In her Opening Brief, plaintiff raises the following issues: (1) whether or not the ALJ erred in improperly rejecting the opinions of the claimant's treating and examining medical providers; (2) whether or not the ALJ erred in improperly rejecting the lay witness testimony; (3) whether or not the ALJ erred in improperly rejecting the claimant's own testimony; and (4) whether or not the ALJ erred in failing to meet his step five burden and in relying exclusively on the grid rules despite the existence of significant non-exertional limitations (*see* ECF No. 15, p. 1).

1

<u>STANDARD OF REVIEW</u>

2

Plaintiff bears the burden of proving disability within the meaning of the Social

3

Security Act (hereinafter "the Act"); although the burden shifts to the Commissioner on

4

the fifth and final step of the sequential disability evaluation process. *Meanel v. Apfel*,

5

172 F.3d 1111, 1113 (9th Cir. 1999); *see also Johnson v. Shalala*, 60 F.3d 1428, 1432

6

(9th Cir. 1995); *Bowen v. Yuckert*, 482 U.S. 137, 140, 146 n. 5 (1987). The Act defines

7

disability as the "inability to engage in any substantial gainful activity" due to a physical

8

or mental impairment "which can be expected to result in death or which has lasted, or

9

can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

10

§§ 423(d)(1)(A), 1382c(a)(3)(A).  Plaintiff is disabled under the Act only if plaintiff's

11

impairments are of such severity that plaintiff is unable to do previous work, and cannot,

12

considering plaintiff's age, education, and work experience, engage in any other

13

substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A),

14

1382c(a)(3)(B); *see also  Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

15

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's

16

denial of social security benefits if the ALJ's findings are based on legal error or not

17

supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d

18

1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

19

1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is

20

such "'relevant evidence as a reasonable mind might accept as adequate to support a

21

conclusion.'" *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (*quoting Davis v.

22

Heckler*, 868 F.2d 323, 325-26 (9th Cir. 1989)); *see also Richardson v. Perales*, 402 U.S.

23

24

389, 401 (1971). Regarding the question of whether or not substantial evidence supports the findings by the ALJ, the Court should "'review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" *Sandgathe v. Chater*, 108 F.3d 978, 980 (1996) (per curiam) (*quoting Andrews, supra*, 53 F.3d at 1039). In addition, the Court must determine independently whether or not "'the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" *See Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2006) (*citing Moore v. Comm'r of the Soc. Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (*citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (other citation omitted)); *see also Molina v. Astrue*, 674 F.3d 1104, 1121,  2012 U.S. App. LEXIS 6570 at *42 (9th Cir. 2012); *Stout v. Commissioner of Soc. Sec.*, 454 F.3d 1050, 1054 (9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision") (citations omitted). In the context of social security appeals, legal errors committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate disability conclusion when considering the record as a whole. *Molina, supra*, 674 F.3d 1104, 2012 U.S. App. LEXIS 6570 at *24-*26, *32-*36, *45-

*46; *see also* 28 U.S.C. § 2111; *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009); *Stout, supra*, 454 F.3d at 1054-55.

<u>DISCUSSION</u>

(1)     **Whether or not the ALJ erred in improperly rejecting the opinions of the claimant's treating and examining medical providers**.

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (*citing Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990)). Even if a treating or examining physician's opinion is contradicted, that opinion can be rejected only "for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester, supra*, 81 F.3d at 830-31 (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

In addition, the ALJ must explain why his own interpretations, rather than those of the doctors, are correct. *Reddick, supra*, 157 F.3d at 725 (*citing Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss *all* evidence presented." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam).  The ALJ must only explain why "significant probative evidence has been rejected." *Id.* (*quoting Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981)).

In general, more weight is given to a treating medical source's opinion than to the opinions of those who do not treat the claimant. *Lester, supra*, 81 F.3d at 830 (*citing Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)).  On the other hand, an ALJ need not accept the opinion of a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings or by the record as a whole. *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1195 (9th Cir. 2004) (*citing Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." *Lester, supra*, 81 F.3d at 830 (citations omitted); *see also* 20 C.F.R. § 404.1527(d).  A non-examining physician's or psychologist's opinion may not constitute substantial evidence by itself sufficient to justify the rejection of an opinion by an examining physician or psychologist. *Lester, supra*, 81 F.3d at 831 (citations omitted). However, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." *Tonapetyan, supra*, 242 F.3d at 1149 (*citing Magallanes, supra*, 881 F.2d at 752).  "In order to discount the opinion of an examining physician in favor of the opinion of a nonexamining medical advisor, the ALJ must set forth specific, *legitimate* reasons that are supported by substantial evidence in the record." *Van Nguyen v. Chater*, 100 F.3d 1462, 1466 (9th Cir. 1996) (*citing Lester, supra*, 81 F.3d at 831); *see also* 20 C.F.R. § 404.1527(d)(2)(i).

//

//

a.   Dr. Curtis H. Holder, M.D., treating psychiatrist

Dr. Holder indicated on his April 9, 2010 medical source statement that he had been plaintiff's treating psychiatrist from September, 2008 through January, 2009; and from February, 2010 until April 9, 2010, when he provided his opinion (*see* Tr. 344). He indicated his diagnoses of PTSD; Major Depression, and Anxiety Disorder, Not otherwise specified, among other things (*see id.*). Dr. Holder opined that plaintiff would be absent from work more than three times a month due to her impairments or treatment (*see* Tr. 345).

Dr. Holder also opined that plaintiff suffered from extreme loss in her ability to maintain attention and concentration for extended periods; to maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; complete a normal workday or workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods (*see* Tr. 346). Dr. Holder also opined that plaintiff suffered from a marked loss in her ability to understand and remember detailed instructions; carry out detailed instructions and deal with stress of semi-skilled and skilled work (*see id.*).

Regarding social factors, Dr. Holder opined that plaintiff could interact appropriately with the public; maintain socially appropriate behavior; and get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes; however, he opined that she suffered from an extreme loss in her ability to accept instructions and respond appropriately to criticism from supervisors (*see* Tr. 347).

Dr. Holder opined that plaintiff suffered from no restrictions in her activities of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistent or pace resulting in a failure to complete tasks in a time work manner; and continual episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors) (*see id.*).

In October, 2010, Dr. Holder provided a narrative summary of plaintiff's care (*see* Tr. 510-13). He described how plaintiff was suffering from a failing abusive marriage when plaintiff first came to his care (*see* Tr. 510). Regarding the end of plaintiff's marriage, Dr. Holder indicated as follows:

> They divorced, but this process many months (sic) to finalize. There were incidences of stalking behavior toward the patient. Essentially, she exhibited classical signs and symptoms of Post Traumatic stress disorder-Patient was in fear for her safety (for a period of time), her response to this was via fear/helpless feeling. She became sensitized to anything that would remotely remind [h]er of her husband and the conflict, she had distressing recollections of the arguments they had and at time felt like (sic) she was being monitored. Avoidance behaviors occurred with this where patient started to her chronic tendency to be mostly housebound in that time frame. Gradually she started to cut herself off from her friends, decrease her social activities and generally insulate herself from the world. Neurovegetative aspects of her care that were disrupted were her sleep difficulties, concentration issues, hypervigilence and increased startle response.

(Tr. 510).

Dr. Holder also noted that these symptoms "spread to the work environment," opining that there "was clearly some transference of the PTSD symptoms to the male

work boss" (*see* Tr. 510-11). Plaintiff ended care with Dr. Holder on June 1, 2009 due to insurance reasons (*see* Tr. 511). However, Dr. Holder indicated that she returned to his care in February, 2010, and he opined that at that time, "there was a mark difference to the patient – a significantly deteriorated state" (*id.*).

Dr. Holder described plaintiff as completely home bound after returning to his care (*see id.*).  He noted that most of her psychotherapy had been focused on plaintiff's "transitional element" from her former "higher socio-economic expectation" (*see id.*). He summarized plaintiff's transition as follows:

> Essentially, the patient's previous world was one in which she was the hostess figure in parties which would include at times, hundreds of individuals. This is contrasted with her acquired habit of not returning her friends phone calls. The patient was ashamed. She was used to a higher socio-economic expectation and she was out of work. Previously she had told her friends about her marital difficulties, and now she was physically dependent on her present husband to even dress and groom herself. In the past, she was used to a robust intellect and memory. Now she has been reduced to looking forward to good days in which lesser level of memory and cognition speeds impairment exist.

(Tr. 511).

Dr. Holder opined that plaintiff's depression was "more of a clinical issue during this second period of my care" (*id.*), and also noted that her physical health status had changed as well (*see* Tr. 512). Dr. Holder noted that plaintiff reported at least "two major episodes in which she has felt unable to speak correctly, feeling mentally fogged (more so than usual), and experiencing a bit of in coordination" (*id.*). Dr. Holder rated plaintiff's global assessment of functioning ("GAF") at 20, and opined that it was 40 a year ago (*see* Tr. 513).

Dr. Holder further provided a psychological/psychiatric evaluation of plaintiff on July 8, 2011 (*see* Tr. 614-20). He indicated that plaintiff suffered from the markedly severe symptom of short term memory impairment and moderately severe symptoms of labile, shallow or coarse affect (*see* Tr. 615).

Dr. Holder also noted that he personally observed plaintiff's moderate symptoms of depression and he opined that plaintiff's symptoms would affect her work activities in that they would result in a decrease in motivational drive (*see id.*). Similarly, he indicated that he observed plaintiff's symptom of decreased concentration, and indicated that her decreased concentration would require her to re-read manuals (*see id.*). Dr. Holder opined that plaintiff's decreased concentration would have a severe affect on her ability to perform during a normal workday, which is defined as "Inability to perform one or more basic work-related activities" (*see id.*).

Dr. Holder observed plaintiff's symptom of memory loss, indicating that plaintiff suffered from moderate to severe impairment in this area and that it would manifest as "loss of track of work elements" (*see id.*). Dr. Holder observed plaintiff's symptom of interpersonal defense, opined that this symptom would have a severe affect on plaintiff's work activities and that it would manifest as plaintiff being either "too defensive or overly gullible" (*see id.*).

Dr. Holder indicated specific functional limitations on plaintiff's functional capacity (*see* Tr. 616). He opined that he did not observe that plaintiff demonstrated errors in performing routing tasks, nor in understanding, remembering and persisting in tasks following a simple instruction (*see id.*). Therefore, he opined that she suffered from

only mild limitation on her ability to perform routine tasks without supervision and to

understand, remember and persist in simple tasks (*see id.*).

In contrast to this finding of mild limitation, Dr. Holder indicated that he observed

plaintiff's specific failures in her ability to understand, remember and persist in tasks by

following complex instructions of three or more steps, and he opined that plaintiff

suffered from severe functional limitations in this cognitive factor (*see id.*). Dr. Holder

opined that plaintiff suffered from mild functional limitation in her ability to maintain

appropriate behavior in a work setting, and he specified that he was "concerned about

domineering male supervisors" (*see id.*). Regarding plaintiff's prognosis, Dr. Holder

opined that plaintiff "may be able to obtain a job, [but] I am concerned that she would not

be able to sustain employment" (*see id.*).

The ALJ gave little weight to the opinion of treating psychiatrist, Dr. Holder (*see*

Tr. 50-51). In part, the ALJ indicated the existence of "multiple inconsistencies in Dr.

Holder's reports that make his findings unpersuasive" (*see* Tr. 50). However, although

the ALJ notes that Dr. Holder opined that plaintiff could manage her own benefits and

had no limitations in her activities in daily living; and in the same report opined that she

had frequent deficiencies in her concentration, persistence and pace and continual

episodes of decompensation, these are not necessarily inconsistent opinions (*see id.*). The

ALJ has not explained why his interpretation is more correct than Dr. Holder's, as the

ALJ is required to do. *See Reddick, supra*, 157 F.3d at 725 (*citing Embrey*, *supra*, 849

F.2d at 421-22. In addition, in this report, Dr. Holder did not opine that plaintiff suffered

from continual episodes of decompensation, he opined that plaintiff suffered from

continual episodes of deterioration or decompensation in work or work-like settings, which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors) (*see* Tr. 347). The Court's description of Dr. Holder's treatment record above, and other information from Dr. Holder's treatment record, indicate a clear basis for Dr. Holder's opinion. The Court notes here Dr. Holder's description of plaintiff's request for work accommodation, his opinion that there was "clearly some transference of the PTSD symptoms to the male work boss," and his discovery later following plaintiff's return to his care that she had an "intolerance of ever going back to her work environment due to her PTSD-like response in interfacing with her former boss" (*see* Tr. 510-511). Based on the relevant record, the Court concludes that this finding of an inconsistency by the ALJ is based in part of an erroneous reading of the record and is not supported by substantial evidence in the record as a whole.

Similarly, the ALJ found an inconsistency between Dr. Holder's opinion that plaintiff suffered from marked limitations in social functioning, and his indications that plaintiff could interact appropriately with the public, get along with others and maintain socially appropriate behavior (*see* Tr. 50). However, this finding of an inconsistency is based on an incomplete review of Dr. Holder's treatment record and opinion, as on the same page on which Dr. Holder indicated plaintiff's abilities and limitations as set out by the ALJ, Dr. Holder also indicated his opinion that plaintiff suffered from extreme loss in her ability to accept instructions and respond appropriately to criticism from supervisors (*see* Tr. 347). Just because she could maintain socially appropriate behavior, this does not

mean that she could accept instructions and respond appropriately to criticism from supervisors.  When the multiple social factors are considered in context, Dr. Holder's opinion regarding extreme loss in ability to respond appropriately to criticism from supervisors provides a basis for his opinion that plaintiff suffered from marked limitations in social functioning overall.

The ALJ's failure to credit Dr. Holder's opinions resulted in the ALJ not incorporating those opinions when evaluating plaintiff's residual functional capacity. In fact, the ALJ did not call vocational expert testimony, instead relying on the vocational guidelines or "grids," due to his finding that plaintiff's nonexertional impairments did not erode significantly plaintiff's occupational base for sedentary unskilled work (*see* Tr. 55). This is harmful legal error.

The ALJ's final finding regarding inconsistency concerns Dr. Holder's assignment of different global assessments of functioning ("GAF") (*see* Tr. 50). However, again, this finding by the ALJ is based on error. First, the Court finds persuasive plaintiff's argument that GAFs frequently change for mental health patients over time and generally represent an assessment of the person's ability to function at that time, based on many types of factors. Therefore, reaching different GAF assessments within a few months is not inconsistent, in fact, it is somewhat expected.

Second, and perhaps more importantly, the ALJ rejects Dr. Holder's assignment of a GAF for plaintiff of 20 in October, 2010 on the basis that "there is absolutely no evidence of these limitations in the record," for, among other limitations, "occasional failure to maintain minimal personal hygiene or gross impairment in communication"

(*see* Tr. 50; *see also* Tr. 513). Despite the ALJ's finding, there is such evidence in Dr. Holder's four-page report cited by the ALJ (*see* Tr. 50 (*citing* Exhibit 20F, *i.e.*, Tr. 510-13)). Dr. Holder indicated that "now she was physically dependent on her present husband to even dress and groom herself," providing some evidence that plaintiff suffered from occasional failure to maintain minimal personal hygiene (*see* Tr. 511). Similarly, Dr. Holder indicated in his treatment record plaintiff's report of at least "two major episodes in which she has felt unable to speak correctly, feeling mentally fogged (more so than usual)," providing evidence that plaintiff suffered from gross impairment in communication (*see* Tr. 512). This again demonstrates that the ALJ's conclusions regarding Dr. Holder's opinions are not supported by substantial evidence in the record.

Third, the ALJ's finding that Dr. Holder focused only on high demand work, such as the type plaintiff did in the past, and that he did not appear to "even consider if she can function performing menial, routine or repetitive tasks," is not a finding supported by substantial evidence in the record as a whole (*see* Tr. 51). On July 8, 2011, Dr. Holder clearly indicated that plaintiff may be able to perform some menial tasks when he concluded that plaintiff suffered only mild limitations in her ability to understand, remember and persist in tasks following simple instructions (*see* Tr. 616). Dr. Holder also opined that plaintiff was able to perform routine tasks without undue supervision (*see id.*). For these reasons, and based on the relevant record, the Court concludes that the ALJ's finding that Dr. Holder "appears to not even consider if [plaintiff] can function performing menial, routine or repetitive tasks" is not based on substantial evidence in the record as a whole.

For the reasons discussed, and based on the relevant record, the Court concludes that the ALJ committed multiple errors in his evaluation of the opinion of Dr. Holder.

Dr. Holder provided numerous opinions regarding non-exertional impairments suffered by plaintiff, including his opinion that plaintiff suffered from extreme loss in her ability to accept instructions and respond appropriately to criticism from supervisors (*see* Tr. 347). The ALJ did not include any limitations on plaintiff's residual functional capacity with respect to her ability to accept instructions and respond appropriately to criticism from supervisors (*see* Tr. 41). This demonstrates that the ALJ's errors in his review of Dr. Holder's opinion were not "'inconsequential to the ultimate nondisability determination.'" *See Molina*, *supra*, 674 F.3d at 1115 (*quoting Carmickle*, *supra*, 533 F.3d at 1162). In addition, as discussed briefly below, *see infra*, section 4, this error also affected the ALJ's use at step five of the grids.

For this reason and based on the relevant record, the Court concludes that this matter should be reversed and remanded for further proceedings.

b.  Dr. Katrina Higgins, Psy.D., examining doctor

Dr. Higgins examined and evaluated plaintiff on July 15, 2010 (*see* Tr. 357-61). The ALJ discussed her opinion as follows:

> Katrina Higgins, PsyD, performed a consultative evaluation of the claimant in July 2010. She diagnosed her with PTSD, major depressive disorder and rated her GAF at 50, demonstrating serious impairment in functioning. She noted the claimant was very anxious throughout the evaluation and had some difficulty concentrating on tasks. Dr. Higgins felt the claimant's psychological and physical symptoms impaired her ability to function independently. Specifically, she felt the claimant had deficits in memory and concentration that would impair her ability to

> manage funds. She also felt the claimant needed continued assistance
> with her self-care and activities of daily living. She felt her mental ability
> to withstand pressures of daily work is severely impaired and her anxiety
> around others would interfere with her ability to interact appropriately
> with coworkers, supervisors and the public. She felt she would not be
> able to understand, remember and carryout even short and simple
> instructions without difficultly and she also would not likely be able to
> maintain regular attendance in the workplace or complete a normal
> workday without interruptions (internal citation to Exhibit 10F).

(Tr. 51).

The ALJ found that Dr. Higgins' opinions contrasted sharply with the other evidence of record, however, the Court notes that there are some important consistencies with aspects of Dr. Holder's opinion that were not discussed by the ALJ (*see* Tr. 51). For example, Dr. Higgins found that plaintiff appeared to require continued assistance with her self-care and ADLs, and, like Dr. Holder's report, her report noted that plaintiff's husband and daughter helped plaintiff with her grooming and hygiene (*see* Tr. 359, 511). Similarly, Dr. Higgins opined that plaintiff would not be likely to maintain regular attendance in the workplace or complete a normal workday without interruptions (*see* Tr. 361). Dr. Holder opined that plaintiff, on average, would be absent from work more than three times a month (*see* Tr. 345). They both opined that plaintiff would suffer from significant limitation on her ability to interact with supervisors. Based on these reasons and the record, the Court concludes that the ALJ's finding that Dr. Higgins' opinions contrast sharply with the other evidence of record is not based on substantial evidence in the record as a whole.

The ALJ also found that Dr. Higgins "relied quite heavily on the subjective report of symptoms and limitation provided by the claimant rather than her own findings on

REPORT AND RECOMMENDATION- 17

testing and seemed to uncritically accept as true most, if not all, of what the claimant reported" (*see* Tr. 51). The ALJ offers no evidence in support of this assertion.

Dr. Higgins indicated that her opinion was based on "today's evaluation" (*see* Tr. 361). She indicated that she reviewed many records of plaintiff (*see* Tr. 357) and noted that plaintiff "appeared very apprehensive and anxious at the start of the interview but relaxed some as the interview progressed" (*see* Tr. 359). Dr. Higgins observed plaintiff's anxious mood and conducted a mental status examination (*see* Tr. 359-60). She observed that plaintiff "had some difficulty recalling dates of significant life events, could not recall what she ate for breakfast the day before the exam, and could only recall 1 out of 3 items after five minutes" (*see* Tr. 360). Dr. Higgins also indicated that plaintiff "displayed a moderately impoverished fund of information, noting that plaintiff was unable to name the U.S. Vice-President or the governor of Washington; and did not know which states border this one, the number of ounces in a pound, the direction of the sunrise, or the reason we celebrate the fourth of July (*see id.*). Regarding concentration, Dr. Higgins observed that plaintiff "struggled to complete digit span (5 digits forward, 3 backward) and had to use her fingers to count backward by threes" (*see id.*). Dr. Higgins assessed that overall plaintiff "had some difficulty concentrating on tasks she was asked to perform but was generally able to participate appropriately in the evaluation process" (*see id.*).

The Court concludes based on the relevant record that the ALJ's finding that Dr. Higgins "apparently relied quite heavily on the subjective report of symptoms and limitation provided by the claimant rather than her own findings on testing and seemed to

1    uncritically accept as true most, if not all, of what the claimant reported" is not based on

2    substantial evidence in the record as a whole (*see* Tr. 51).

3         The ALJ made determinative findings in his RFC that conflict with Dr. Higgins'

4    opinions, such as the opined limitations on interacting with supervisors (*see* Tr. 41).

5    Therefore, this provides an additional reason that this matter should be reversed and

6    remanded.

7

8         c.  Lay evidence provided by other medical source, Rachel McElvain, PA-C

9         The ALJ gives "zero weight" in his written decision to the opinion of Physician

10   Assistant - Certified ("PA-C") McElvain (*see* Tr. 49). Although she is not an acceptable

11   medical source, PA-C McElvain is an "other medical" source, and evidence from "other

12   medical" sources, that is, lay evidence, can demonstrate "the severity of the individual's

13   impairment(s) and how it affects the individual's ability to function." *See* SSR 06-03p,

14   2006 SSR LEXIS 5 at *4.

15

16        The Social Security Administration has recognized that with "the growth of

17   managed health care in recent years and the emphasis on containing medical costs,

18   medical sources who are not 'acceptable medical sources,'  . . .  have increasingly

19   assumed a greater percentage of the treatment and evaluation functions previously

20   handled primarily by physicians and psychologists." *Id.* at *8. Therefore, according to the

21   Social Security Administration, opinions from other medical sources, "who are not

22   technically deemed 'acceptable medical sources' under our rules, are important and

23   should be evaluated on key issues such as impairment severity and functional effects." *Id.*

24

The Ninth Circuit has characterized lay witness testimony as "competent evidence," noting that an ALJ may not discredit "lay testimony as not supported by medical evidence in the record." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (*quoting Van Nguyen, supra*, 100 F.3d at 1467) (*citing Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996)).

The ALJ here gave zero weight to the assessment by PA-C McElvain due to "no significant findings in this record to support such dire limitations" (*see* Tr. 49). This is directly contrary to the Ninth Circuit's admonition that an ALJ may not discredit "lay testimony as not supported by record" without further explanation. The ALJ's assumption that PA-C McElvain based her opinion "on subjective report in a secondary gain context" is not further supported by explanation or any citation by the ALJ to the record, and, therefore, is based on legal error.

(2)        **Whether or not the ALJ erred in improperly rejecting the plaintiff's own testimony**.

The Court already has determined that the ALJ erred in his review of the medical evidence, *see supra*, section 1. In addition, a determination of a claimant's credibility relies in part on the assessment of the medical evidence. *See* 20 C.F.R. § 404.1529(c). Therefore, plaintiff's testimony and credibility should be evaluated anew following remand of this matter.

(3)     **Whether or not the ALJ erred in improperly rejecting the lay witness testimony**.

The ALJ rejected the lay witness testimony provided by plaintiff's then husband, Kevin Biggs, in part due to the ALJ's finding of "several reasons to question the credibility of the claimant's allegations" (*see* Tr. 47). The Court already has concluded that plaintiff's credibility and testimony should be evaluated anew following remand of this matter. For this reason, this lay testimony should be evaluated anew following remand of this matter.

(4)     **Whether or not the ALJ erred in failing to meet his step five burden and in relying exclusively on the grid rules despite the existence of significant non-exertional limitations**.

According to the Ninth Circuit, a vocational expert's testimony is required at step five "when the non-exertional limitations are at a sufficient level of severity such as to make the grids inapplicable to the particular case." *See Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007). The non-exertional limitations must be of a sufficiently limited level of severity such that a claimant's range of work permitted by the claimant's exertional limitations, is not significantly limited by the non-exertional limitations. *See id.* Otherwise, a vocational expert's testimony is required at step five. *See id.*

As noted previously during the discussion of Dr. Holder's opinions, *see supra*, section 1, the ALJ relied on the Grids due to a finding that plaintiff did not have non-exertional limitations that would significantly affect her ability to work (*see* Tr. 55; *see*

*also* Tr. 347). However, the Court has determined that the ALJ erred in evaluating

plaintiff's non-exertional limitations, *see supra*, section 1. Therefore, the Court concludes

that the ALJ should revisit the use of the Grids in this matter after a proper evaluation of

the medical evidence.

(5)         **Whether this matter should be remanded with a direction to award**

**benefits or for further proceedings.**

Generally, when the Social Security Administration does not determine a

claimant's application properly, "'the proper course, except in rare circumstances, is

to remand to the agency for additional investigation or explanation.'" *Benecke v.*

*Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). However, the Ninth

Circuit has put forth a "test for determining when [improperly rejected] evidence

should be credited and an immediate award of benefits directed." *Harman v. Apfel*,

211 F.3d 1172, 1178 (9th Cir. 2000). It is appropriate when:

> (1) the ALJ has failed to provide legally sufficient reasons for
> rejecting such evidence, (2) there are no outstanding issues that
> must be resolved before a determination of disability can be
> made, and (3) it is clear from the record that the ALJ would be
> required to find the claimant disabled were such evidence
> credited.

*Harman, supra,* 211 F.3d at 1178 (*quoting Smolen v. Chater*, 80 F.3d 1273, 1292 (9th

Cir.1996)).

Here, outstanding issues must be resolved. *See Smolen, supra*, 80 F.3d at 1292. It

is not clear from the record that the ALJ would have been required to find plaintiff

disabled had the incorrectly rejected evidence been credited fully. The ALJ's reliance on the Grids and his failure to call vocational testimony contributed to this fact. Furthermore, the decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court. *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989) (*citing Varney v. Secretary of HHS*, 859 F.2d 1396, 1399 (9th Cir. 1988)).

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).   If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (*quoting Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980))).

Therefore, remand is appropriate in order to allow the Commissioner the opportunity to consider properly all of the lay and medical evidence as a whole and to incorporate the properly considered lay and medical evidence into the consideration of plaintiff's credibility and residual functional capacity. *See Sample, supra*, 694 F.2d at 642.

<u>CONCLUSION</u>

Based on the stated reasons, and the relevant record, the undersigned recommends that this matter be **REVERSED** and **REMANDED** pursuant to sentence four of 42

U.S.C. § 405(g) to the Acting Commissioner for further consideration.  **JUDGMENT**

should be for **PLAINTIFF** and the case should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R.

Civ. P. 6.  Failure to file objections will result in a waiver of those objections for

purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C).

Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the

matter for consideration on September 6, 2013, as noted in the caption.

Dated this 16th day of August, 2013.

J. Richard Creatura
United States Magistrate Judge